NOT DESIGNATED FOR PUBLICATION

No. 129,363

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of S.D.,
a Minor Child.

MEMORANDUM OPINION

Appeal from Leavenworth District Court; JOHN J. BRYANT, judge. Submitted without oral argument. Opinion filed March 6, 2026. Affirmed.

*Chadler E. Colgan*, of Colgan Law Firm, LLC, of Kansas City, for appellant natural father.

*Kirstyn Dvorak*, assistant county attorney, and *Todd Thompson*, county attorney, for appellee.

Before WARNER, C.J., MALONE and HILL, JJ.

HILL, J.: To get S.D., his five-week-old daughter, to stop crying, Father bit her. Father later admitted to other acts of ill treatment. For these acts, he was prosecuted, convicted, and sentenced to prison. In this proceeding, dealing with his parentage rights, a district court found Father was unfit to parent S.D. The court also found that Father's parental unfitness was unlikely to change in the foreseeable future and found further that the termination of Father's parental rights was in S.D.'s best interests. This is Father's appeal of the termination of his parental rights to S.D.

Father attacks the court's holding in three ways. First, Father claims that there was insufficient clear and convincing evidence to support a finding under K.S.A. 38-2269(b)(7) that Cornerstones of Care, the agency tasked with reintegrating families, had made reasonable efforts to rehabilitate the family. Second, Father argues that there was

1

insufficient clear and convincing evidence to support the district court's determination that his inability to properly care for S.D. was unlikely to change in the foreseeable future. Finally, he contends that the district court's decision to terminate his parental rights was an abuse of discretion. He argues that even when the evidence is reviewed in the light most favorable to the State, termination of his parental rights was not supported by a preponderance of the evidence. Father claims this deficiency of evidence is a legal error. A legal error, of course, by definition, is an abuse of a court's discretion. See *In re K.W.D.*, 321 Kan. 100, 116, 573 P.3d 221 (2025).

*We set out the statutory path a court must follow when deciding these issues.*

Kansas statutes provide a framework for a court to follow when asked to terminate a parent's right to a child. We summarize some of the laws that must be considered as we make our decision. First, we look at the conduct and condition of the parent and child. Then we must decide whether such conditions will extend into the future. And finally, we must decide what is in the best interests of the child.

Before terminating a parent's rights, a district court first considers whether there is clear and convincing evidence that the parent is unfit because of conduct or condition which renders the parent unable to care properly for their child. K.S.A. 38-2269(a).

After a district court finds that clear and convincing evidence supports that a parent is unfit because of conduct or condition to properly care for their child, it next considers whether the conduct or condition that is preventing the parent from properly caring for their child "is unlikely to change in the foreseeable future." K.S.A. 38-2269(a). Courts should "examine the 'foreseeable future' from the child's perspective because children and adults have different perceptions of time; a month or a year can seem considerably longer for a child than for an adult." *In re K.W.D.*, 321 Kan. at 112-13; see K.S.A. 38-2201(b)(4).

2

When a parent is incarcerated, as is the case here, release from imprisonment should not be treated as the "definitive point" when the parent will be able to properly care for the child. *In re K.W.D.*, 321 Kan. at 113. Instead, a parent's anticipated release date should be considered alongside all other relevant circumstances, including "the time and resources required for the parent to secure housing, employment, treatment, and rebuild the parent-child relationship," as part of "a forward-looking assessment of whether the parent will be able to care properly for the child in the near term." 321 Kan. at 113.

If a district court finds by clear and convincing evidence that a parent is unfit because of conduct or condition that renders them unable to care properly for their child and the inability to properly parent is unlikely to change in the foreseeable future, the court must next determine whether termination of parental rights is in the best interests of the child. See K.S.A. 38-2269(a), (g)(1). In making this determination, the district court "shall give primary consideration to the physical, mental and emotional health of the child." K.S.A. 38-2269(g)(1). If termination best serves a child's physical, mental, or emotional needs, "the court shall so order." K.S.A. 38-2269(g)(1).

*A medical examination of a child leads to State action to protect that child.*

In June 2023, S.D.'s mother took her to St. John's Hospital when a wound on S.D.'s hand would not stop bleeding after a bandage change. When they arrived at the hospital, a medical provider noted bruising on S.D.'s face, which her mother stated had been caused when S.D. accidentally fell out of her swing. S.D. was then transferred to Children's Mercy Hospital.

On the same day, the Kansas Department for Children and Families received a report that S.D. had been admitted to Children's Mercy for a skin infection and multiple injuries across her body. S.D.'s injuries included multiple bruises from bite marks to her

arms, legs, and feet; abrasions on multiple limbs and the back of her head; and a laceration to her right palm. Doctors diagnosed the cause of S.D.'s injuries as child abuse.

Later, the Leavenworth Police Department interviewed S.D.'s parents. S.D.'s mother denied harming S.D. in any way. Father, however, admitted to biting her on the arm three times. Based on Father's admissions, the Department was granted temporary custody of S.D. Father was taken into police custody based on his admissions of abuse.

In July 2023, Cornerstones developed a reintegration plan for Father. This plan included tasks such as frequent contact with S.D., learning the effects of drug use and domestic violence on children, completion of a parenting evaluation and parenting program, anger management classes, a mental health assessment, abstaining from drug or alcohol use, and maintaining suitable housing and a legal source of income. The plan noted that Father would complete the plan within six months of signing and that he would discuss any problems he was having in completing the plan with both his attorney and Cornerstones staff.

The district court held an adjudication and disposition hearing concerning Father in August 2023. Father did not contest the matter. Accordingly, the district court adjudicated S.D. as a child in need of care and ordered that she remain in the Department's custody. Similar proceedings were held separately regarding S.D.'s mother.

A year later, Father did not appear at a permanency hearing to determine whether he had made progress towards reintegration with S.D. The court found that public or private agencies had made reasonable efforts to assist and support the family to accomplish permanency goals as stated in the permanency plan and that Father's progress towards those goals was not adequate. As a result, the district court ordered that S.D.'s reintegration with Father was no longer a viable goal.

About a week after the permanency hearing, the State moved for a finding that Father was unfit to parent S.D. and sought the termination of his parental rights. The motion noted that, in June 2024, Father had been convicted of aggravated battery for his abuse of S.D. and been sentenced to 32 months in prison.

The State also alleged in its motion that Father was unfit to properly parent S.D. because:

- he had engaged in physically, emotionally, or sexually cruel conduct against her under K.S.A. 38-2269(b)(2);
- he had physically, mentally, or emotionally neglected S.D. under K.S.A. 38-2269(b)(4);
- he had been convicted of a felony and served a term of imprisonment under K.S.A. 38-2269(b)(5);
- there had been a failure of reasonable efforts by public or private agencies to rehabilitate the family under K.S.A. 38-2269(b)(7); and
- Father had demonstrated a lack of effort to adjust his circumstances, conduct, or conditions to meet S.D.'s needs under K.S.A. 38-2269(b)(8).

The State also argued that Father's unfitness was unlikely to change in the foreseeable future and, thus, termination of Father's rights was in S.D.'s best interests.

In October 2024, the district court held Father's termination of parental rights hearing. The parties agreed to admit reports from the Court Appointed Special Advocate and Cornerstones. And the district court took judicial notice of Father's case based on his criminal abuse of S.D. Both Father and Abbi Cook, a permanency manager for Cornerstones, testified.

5

*Father's testimony*

During Father's testimony, he agreed that he had caused his daughter physical harm by biting her and that she almost lost her arm due to his actions, as well as the failure to immediately seek medical treatment for her injuries. He agreed that such conduct was physically and emotionally cruel, abusive in nature, and physically, mentally, or emotionally neglectful.

Father added that, because of his actions towards S.D., he was convicted of and imprisoned for the felony of aggravated battery. As a result of the abuse and subsequent criminal charges, Father had not seen S.D. since she was admitted to the hospital in 2023, at first by his own volition and later by a no-contact order. Upon his release from prison, Father indicated that he would not have had contact with S.D. for 32 of the 33 months she had been alive.

Father stated that, at the time of the abuse, S.D.'s "purple crying" led him to a stress-induced blackout and only after he bit S.D. had he realized what he had done. When S.D.'s mother saw the wound, Father indicated that he lied about the cause of the injury. The wound then became infected and turned brown, and Father testified that it was just his "[s]tupid pride" that kept him from getting the wound treated in a timely manner. He explained that he "didn't want to admit" that he had a mental health problem; so, he kept telling himself that S.D.'s injuries weren't that bad; it wouldn't affect their future; and everything would be fine.

When asked what efforts he had made to reintegrate with S.D., Father testified that he received assigned tasks to complete under his parenting plan after his arrest and, as of the date of the termination hearing, the only task that he had completed was getting a mental health assessment. This assessment included diagnoses of mania, schizophrenia,

6

anxiety, and depression. For treatment, Father testified that he had been talking to the mental health team "frequently" and taking his medication as prescribed.

Father indicated he had signed up for a Substance Abuse Program that he had not completed and had asked about parenting classes but was told by the prison unit chief that they were not responsible for him taking the classes. Father said that he was willing to take domestic violence classes but said he was not sure what route he needed to go through to take the classes. He testified that he did not know who his case worker was and that he had not received any letters from Cornerstones since June 2024.

*Cook's testimony*

Cook testified that she worked as the case manager on S.D.'s case from June to December 2023 and from July 2024 through the date of the hearing, or about 10 total months over the year and a half that S.D. had been in the State's custody. In her role as case manager, Cook contacted Father both in and out of jail to go over his assigned tasks, made reintegration plans, and asked him if he had any questions or needed any assistance.

Cook advised that her contact with Father while he was in jail occurred by phone, usually only for a few minutes at a time to ask Father if he needed help getting resources. Cook conceded that she never sat down with Father to go over the case plan but advised that the plan would have been presented in court and that she had gone over the tasks in the plan with Father at least three times. She added that there was not anything else that she could offer Father to help him reintegrate with S.D.

The district court then heard the parties' closing arguments. The State relied on testimony from the hearing to assert that it had properly supported the allegations in its motion to terminate Father's parental rights. S.D.'s guardian ad litem agreed that the State

had proven the allegations from its motion and that, while a "termination of parental rights is very difficult[,] . . . the impact, on the child of this, has been significant."

Father conceded that the State had proven the allegations in its motion under K.S.A. 38-2269(b)(2), (b)(4), and (b)(5). He disputed that the State had established its allegations under subsections (b)(7) or (b)(8), however. His counsel noted that Cornerstones could have done more to facilitate reintegration given that Father was incarcerated, specifically regarding mental health and parenting classes.

Counsel also argued that, because of Father's imprisonment, his inability to adjust his circumstances was not purposeful and, instead, that Father was limited in what he could do while in custody. For these reasons, Father maintained that the State had not demonstrated his unfitness by clear and convincing evidence or that his unfitness would not change in the foreseeable future.

The district court took note of the guardian ad litem's comments, specifically that S.D. was only around a month old at the time of the abuse and would be nearly three years old when Father was released from custody. The district court then recounted that Father had made admissions under oath to support findings under K.S.A. 38-2269(b)(2) and (b)(4) by clear and convincing evidence. And the district court noted Father's criminal case, which would satisfy a finding under K.S.A. 38-2269(b)(5).

The district court then moved on to find that the efforts made by Cornerstones were reasonable under K.S.A. 38-2269(b)(7), given that Father had been able to take certain steps towards reintegration. It added that the situation that Father found himself in resulted from his own violent attack on S.D. Regarding K.S.A. 38-2269(b)(8), the district court found that Father had made attempts to change his circumstances. Thus, the State had not established by clear and convincing evidence that a finding under that statutory provision was appropriate.

8

Father told the district court that he had met with a worker from Cornerstones when he was in county jail and had spoken with Cornerstones via phone calls while in prison. He added that no one from Cornerstones had explained how he was supposed to complete the tasks on his reintegration plan while imprisoned at Hutchinson Correctional Facility. Father conceded that he was not in custody for about a month in November 2023 and, during that time, did not reach out to Cornerstones about his required tasks.

Father advised the district court that, upon his release from prison, he intended to find a job, get help from a guidance center, report to his probation officer, and do his parenting classes as required if he was unable to complete them in prison. Regarding his living arrangements, Father mentioned several possibilities including a homeless shelter, with S.D.'s mother, a halfway house, or with his birth mother. Father acknowledged that raising S.D. in those conditions would be difficult, but not impossible.

After making findings of unfitness under K.S.A. 38-2269(b)(2), (b)(4), (b)(5), and (b)(7), the district court then found that Father's unfitness was unlikely to change in the foreseeable future, the court had already found that reintegration was not viable, and that termination of Father's parental rights was in S.D.'s best interests.

In closing, the district court noted that it did not find Father's excuse about blacking out when abusing S.D. as credible. It pointed to Father's decision to lie about S.D.'s injuries as proof that he had not really blacked out and, instead, merely wanted others to believe he had blacked out. Thus, the district court explained that it did not find Father "credible at all." Father timely appealed.

We turn to the three issues raised by Father in this appeal.

9

*The court properly found reasonable efforts by Cornerstones.*

Father takes the position that Cornerstones' efforts were not reasonable given Father's incarceration in both county jail and with the Department of Corrections. He maintains that because he "did not ask" for resources to assist in meeting the steps required under the reintegration plan, Cornerstones did not provide those resources. He cites to testimony from the record to support his position that he completed every task he could without aid from Cornerstones or another outside organization. Father also maintains Cornerstones should have provided greater support towards his reintegration given his circumstances and, because of this lack of support, the district court's finding under K.S.A. 38-2269(b)(7) that Cornerstones made a reasonable effort to assist him was unsupported.

Taking an opposing view, the State argues the district court properly found by clear and convincing evidence that Father was unable to properly parent S.D. under multiple statutory bases. The State notes that testimony at the termination hearing established Cornerstones repeatedly made Father aware of the steps required for reintegration and offered assistance in accessing resources to complete those tasks that Father did not use.

"The phrase 'reasonable efforts' is not susceptible to precise definition, and its meaning depends largely upon the facts and circumstances of the particular case." *In re D.G.*, 319 Kan. 446, 454, 555 P.3d 719 (2024). Reasonable efforts include "family service agencies [working] with families to create a case plan outlining specific goals, tasks, and timelines for reintegration[,]" as well as monitoring "compliance with the case plan and progress toward completing tasks and attaining goals." 319 Kan. at 454. Another panel of this court found an agency provided "reasonable efforts" when the agency provided a mother with information related to her reintegration responsibilities under the court's

orders and provided referrals for those services. *In re R.S.*, 50 Kan. App. 2d 1105, 1117, 336 P.3d 903 (2014).

A district court's factual findings that a parent is unfit will not be overturned on appeal if, after reviewing all the evidence in the light most favorable to the State, the findings are supported by clear and convincing evidence. *In re Adoption of Baby Girl G.*, 311 Kan. 798, 806, 466 P.3d 1207 (2020). "Clear and convincing evidence is evidence sufficient to establish that the truth of the facts asserted is highly probable [and] is an intermediate standard of proof between a preponderance of the evidence and beyond a reasonable doubt." *Pyle v. Gall*, 317 Kan. 499, 501, 531 P.3d 1189 (2023). In examining the evidence, we will "not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact." *In re D.G.*, 319 Kan. at 452.

Cook's testimony at the termination hearing established that Cornerstones worked with Father to develop a case plan, she had explained the reintegration plan tasks to Father at least three times, and she had periodically checked in to see if he needed Cornerstones' assistance in completing his tasks. She added that Father never communicated any difficulties in completing his assigned tasks or asked Cornerstones to provide referrals or other assistance in completing his tasks.

As noted in the reintegration plan, Father agreed to communicate to Cornerstones any barriers he had to completing tasks in the plan. Thus, Father's argument that his incarceration limited his ability to complete tasks in the plan is invalid given that he did not seek assistance to overcome the challenge of achieving these tasks while in custody.

Additionally, as the district court notes, Father's issues with completing tasks in the reintegration plan were a product of his own making. There is little more that Cornerstones could have reasonably done to facilitate his completion of certain reintegration tasks. For instance, Cornerstones could not help Father overcome a no-

11

contact order to meet the reintegration plan task of frequent contact with S.D. Thus, although Father experienced challenges in his ability to complete the reintegration tasks, this does not mean that Cornerstones could have reasonably done more to help him complete those tasks within the required timeframe.

Testimony and evidence at Father's termination hearing established that Cornerstones repeatedly made him aware of the tasks that he needed to complete for reintegration and asked him what assistance Cornerstones could provide in helping him achieve those tasks. Therefore, the district court did not err by finding that clear and convincing evidence established that reasonable efforts by Cornerstones had failed at reintegrating Father back into S.D.'s life under K.S.A. 38-2269(b)(7).

*We see no reason to modify the court's unfitness findings.*

The question before us is a factual one: Did the State meet its burden to demonstrate that there was clear and convincing evidence to support a finding that Father's unfitness to properly parent S.D. was unlikely to change in the foreseeable future?

Father argues the district court did not properly analyze whether his unfitness to parent S.D. was likely to change in the foreseeable future and, instead, merely discussed the background of the case and that Father's own actions had necessitated the termination hearing. Father contends that his release from prison was set for 14 months after the termination hearing, and he testified that he was aware and willing to use resources to help him parent S.D. He also points to his testimony that, although he did not have firm plans after his release from prison, he had tentative housing plans and demonstrated a willingness to adjust his conditions by undergoing and participating in treatment "to address the terrible acts he committed against S.D." For these reasons, Father asserts that the district court could not have properly found that there was clear and convincing

12

evidence to support a finding that his unfitness was unlikely to change in the foreseeable future.

The State maintains that Father focuses solely on the impending end to his incarceration in his brief while failing to address the district court's findings of unfitness under K.S.A. 38-2269(b)(2), (b)(4), and (b)(5). It points to several pieces of evidence to support the district court's findings, including (1) Father's minimal progress and effort towards reintegration; (2) his lack of concrete living arrangements after his release from prison; (3) his need to find a job, establish mental health services, and enroll in parenting classes; (4) his lack of any relationship with S.D. since she was five weeks old; and (5) his lack of credibility regarding why he abused S.D. The State argues that this evidence, when viewed in its totality, established that Father's unfitness to parent S.D. was unlikely to change in a timeframe reasonable to S.D.

When determining whether a parent's unfitness is likely to change in the foreseeable future, a district court should give weight to actions over intentions and "may look to a parent's past conduct as an indicator of future behavior." *In re K.L.B.*, 56 Kan. App. 2d 429, 447, 431 P.3d 883 (2018); see *In re A.A.*, 38 Kan. App. 2d 1100, 1105, 176 P.3d 237 (2008).

A district court's finding that a parent's conduct or condition rendering the parent from being unable to properly care for the child is unlikely to change in the foreseeable future should be upheld on appeal if, after reviewing all the evidence in the light most favorable to the prevailing party, this court determines that the district court's findings are supported by clear and convincing evidence. Again, we do "not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact." *In re D.G.*, 319 Kan. at 452.

We cannot ignore the obvious. Father's unfitness to properly care for S.D. was unlikely to change in the foreseeable future. Father's remaining prison sentence alone would have prevented him from being properly able to care for S.D. in the foreseeable future, compounded by the fact that he had not seen S.D. since she was roughly a month old. From S.D.'s perspective, Father would be a stranger to her—an unknown adult who had been absent for virtually her entire life.

Furthermore, Father's own testimony indicated that other relevant factors, including his housing and employment situation, were far from set upon his release from prison. Father did not suggest that he had any definitive plans regarding his employment. For housing, Father indicated four tentative solutions, two of which included a halfway house and homeless shelter—options that even Father conceded were likely unsuitable and inappropriate for raising his young daughter.

Father had also made only limited progress towards completing the tasks in his reintegration plan. Although his incarceration contributed to this delay, there were steps that Father could have taken towards seeking treatment, including attending the substance abuse program he had enrolled in, following up on how he could complete his parenting classes, and seeking anger management. His decision not to complete these tasks leans heavily in favor of a finding that Father was not serious about treatment.

When considering all relevant factors, the testimony and evidence from Father's termination hearing established that Father would not be able to properly care for S.D. in the near term, particularly when assessed from her perspective of a young child who had not known her father for virtually her entire life. For these reasons, the district court did not err by finding that clear and convincing evidence established that Father's unfitness to properly parent S.D. was unlikely to change in the foreseeable future under K.S.A. 38-2269(a).

14

*We see no reason to disagree with the court's conclusion that termination of Father's parental rights was in S.D.'s best interests.*

Father frames the district court's decision to terminate his parental rights as an abuse of discretion. He argues that, even when viewed in the light most favorable to the State, termination of his parental rights was not supported by a preponderance of the evidence and, thus, constituted legal error.

In response, the State maintains that the evidence presented at Father's termination hearing supported the district court's finding by a preponderance of the evidence that termination was in S.D.'s best interests. Thus, the State argues the district court did not abuse its discretion by terminating Father's parental rights.

Under K.S.A. 38-2269(a), a district court *may* terminate a parent's rights after a finding of unfitness that is unlikely to change in the foreseeable future. We therefore consider a district court's decision to terminate for an abuse of discretion. Under this standard, we will affirm unless the district court's decision is "'arbitrary, fanciful, or unreasonable,' or based on an error of fact or law." *In re K.W.D.*, 321 Kan. at 116.

Best-interests determinations are generally reviewed by this court for a preponderance of the evidence. *In re E.L.*, 61 Kan. App. 2d 311, 330, 502 P.3d 1049 (2021); *In re R.S.*, 50 Kan. App. 2d at 1116. However, the Kansas Supreme Court has not formally adopted this standard. *In re D.G.*, 319 Kan. at 463 ("[T]his court has yet to decide whether the lower preponderance-of-the-evidence or the higher clear-and-convincing standard of proof applies to factual findings made under [K.S.A. 38-2269](g)(1) and, depending on the answer, the impact this might have on our standard of review.").

The evidence and testimony from Father's termination hearing established the following facts: (1) The district court did not find Father's reasoning for abusing S.D. and covering up her injuries to be credible; (2) Father had virtually no contact with S.D. for nearly her entire life; (3) Father had made limited progress towards reintegration, even for steps that he could have taken despite his incarceration; (4) Father would remain imprisoned for over a year after the date of the termination hearing for his felony abuse against S.D.; and (5) Father did not have definitive plans upon his release from custody to retain employment, housing, or treatment necessary to ensure a safe and stable environment for S.D.

These factors together establish that termination of Father's parental rights best suited the physical, mental, and emotional health of S.D. The district court, in making this difficult decision, followed the law. The court looked at the conduct and the condition of Father, the condition and needs of the child, and made appropriate unfitness findings. Then, using the facts that it had before it, the court decided that things were not going to improve in the future for this child, using a child's frame of reference as a measurement of time. It ended Father's parental rights to S.D. This decision was in the best interests of S.D.

The district court did not legally err by finding that termination was in S.D.'s best interests under K.S.A. 38-2269(g). Father therefore cannot meet his burden to establish the district court abused its discretion by terminating his parental rights. Our review reveals no reason to remand or reverse this decision.

Affirmed.